BENJAMIN W. BULL
AZ Bar No. 009940
JEREMY D. TEDESCO
AZ Bar No. 023497
ALLIANCE DEFENSE FUND
15100 N. 90th Street
Scottsdale, AZ 85260
(480) 444-0020; (480) 444-0028 facsimile
jtedesco@telladf.org

DAVID A. CORTMAN
GA Bar No. 188810
ALLIANCE DEFENSE FUND
1000 Hurricane Shoals Rd., NE
Building D, Suite 600
Lawrenceville, GA 30043
(770) 339-0774; (770) 339-6744 facsimile
dcortman@telladf.org

Attorneys for Plaintiffs

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA
### PHOENIX DIVISION

| | |
|---|---|
| Pastor Clyde Reed; and Good News Community Church, <br><br> Plaintiffs, <br><br> v. <br><br> Town of Gilbert, Arizona; and Adam, Adams in his official capacity as Code Compliance Manager, <br><br> Defendants. | Case No. 2:07-cv-00522-SRB <br><br> **PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM OF LAW IN SUPPORT THEREOF** <br><br> Accompanying Documents: Affidavit of Pastor Clyde Reed Filed in Support <br><br> Oral Argument Requested |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF CONTENTS

Table of Authorities........................................................................................................ ii

Motion for Summary Judgment ......................................................................... 1

Memorandum of Law ........................................................................................ 1

I.   THE SIGN CODE DISCRIMINATES BETWEEN GOOD NEWS' SPEECH AND
     OTHER NONCOMMERCIAL AND COMMERCIAL SPEECH............................... 2

     A. The Sign Code Discriminates Against the Church's Speech Based on
        Content ................................................................................................... 3

     B. The Sign Code Does Not Survive Strict Scrutiny .............................. 8

     C. The Sign Code is Impermissibly Vague and Overbroad .................... 9

II.  THE SIGN CODE VIOLATES PLAINTIFFS' FREEDOM OF RELIGION
     PROTECTED BY THE FIRST AMENDMENT AND ARIZONA'S FERA ........... 10

     A. The Ordinance Must be Subjected to Strict Scrutiny Under the Free Exercise
        Clause Because it is Not Generally Applicable ................................. 11

     B. Strict Scrutiny is Also Required Under Arizona's FERA ................. 13

         1.  The Church has a Sincerely Held Religious Belief to Reach Out to the
             Public Through Use of Signs ...................................................... 14

         2.  Defendants' Sign Code Places a Substantial Burden on Plaintiffs'
             Free Exercise of Religion ............................................................ 14

         3.  The Sign Code Does Not Survive Strict Scrutiny ...................... 16

III. THE SIGN CODE VIOLATES THE CHURCH'S EQUAL PROTECTION
     RIGHTS.......................................................................................................... 17

Conclusion........................................................................................................ 17

i

1

# TABLE OF AUTHORITIES

2

**Cases**

3

*A.A. v. Needville Indep. Sch. Dist,* 633 F.3d 248 (5th Cir. 2010)......................................14

4

*Adver. v. City of Moreno Valley*, 103 F.3d 814 (9th Cir. 1996)..........................................5

5

*Alabama v. Thornhill*, 310 U.S. 88 (1940)..............................................................10

6

*Ball v. Massanari*, 254 F.3d 817 (9th Cir. 2001) ..........................................................17

7

*Blackhawk v. Pennsylvania*, 381 F.3d 202 (3d Cir. 2004) ................................................11

8

*Church of the Lukumi Babalu Aye v. City of Hialeah*, 508 U.S. 520 (1993) ........ 11, 13, 16

9

*Citizens United v. Federal Election Commission*, 130 S.Ct. 876 (2010).......................... 6, 7

10

*City of Lakewood v. Plain Dealer Publishing Co.*, 486 U.S. 750 (1988) ..........................9

11

*Connally v. General Const. Co.*, 269 U.S. 385, 391 (1926).............................................9

12

*Desert Outdoor Adver. v. City of Moreno Valley*, 103 F.3d 814 (9th Cir. 1996)................4

13

*Employment Div., Dept. of Human Res. of Or. v. Smith*, 494 U.S. 872 (1990) .......... 11, 13

14

*Foti v. City of Menlo Park*, 146 F.3d 629 (9th Cir. 1998)...............................................4, 9

15

*G.K. Limited Travel v. City of Lake Oswego*, 436 F.3d 1064 (9th Cir. 2006) ....................5

16

*Gonzales v. O Centro Espírita Beneficente União do Vegetal*, 546 U.S. 418 (2006). 16, 17

17

*Grayned v. City of Rockford*, 408 U.S. 104 (1972)........................................................9

18

*Guru Nanak Sikh Society v. County of Sutter*, 456 F.3d 978 (9th Cir. 2006) ...................16

19

*Holder v. Humanitarian Law Project*, 130 S.Ct. 2705 (2010)..........................................4

20

*Metromedia, Inc. v. City of San Diego*, 453 U.S. 490 (1981) ..........................................8

21

*Meyer v. Grant*, 486 U.S. 414 (1988).......................................................................7

22

*NAACP v. Alabama*, 377 U.S. 288 (1964) .................................................................10

23

*NAACP v. Button*, 371 U.S. 415 (1963) ...................................................................10

24

*Nat'l Adver. Co. v. City of Orange*, 861 F.2d 246 (9th Cir. 1988)....................................8

25

*Nat'l Adver. Co. v. Town of Babylon*, 900 F.2d 551 (2nd Cir. 1990) .................................4

26

*Ranchers Cattlemen Action Legal Fund United Stockgrowers of America v. U.S. Dep't*
27
    *of Agric.*, 499 F.3d 1108 (9th Cir. 2007)..............................................................2

28

*Reed v. Town of Gilbert*, 587 F.3d 966 (9th Cir. 2009).................................................2

*San Jose Christian College v. City of Morgan Hill*, 360 F.3d 1026 (9th Cir. 2004) ........ 11

*Serrano v. Francis*, 345 F.3d 1071 (9th Cir. 2003) ........................................................ 17

*Sherbert v. Verner*, 374 U.S. 398 (1963) .......................................................... 11, 14, 15

*State v. Hardesty*, 214 P.3d 1004 (Ariz. 2009) ...................................... 14, 15, 17

*Solantic, LLC v. City of Neptune Beach*, 410 F.3d 1250 (11th Cir. 2005) ......................... 8

*Tenafly Eruv. Assoc., Inc. v. Borough of Tenafly,* 309 F.3d 144 (3rd Cir. 2002) .. 12, 14, 15

*Whitton v. City of Gladstone*, 54 F.3d 1400 (8th Cir. 1995) .............................. 4, 5, 7, 8, 9

*Wisconsin v. Yoder*, 406 U.S. 205 (1972) ...................................................................... 15

**Statutes**

42 U.S.C.A. § 2000bb ...................................................................................................... 14

Ariz. Rev. Stat. Ann. § 41-1493.01 (2004) .................................................. 13, 14, 15, 17

LRCiv 7.1(d)(1) .................................................................................................................. 1

Tex. Civ. Prac. & Rem. Code § 110.003 ........................................................................ 14

**Other Authorities**

Matthew 28:19-20 ............................................................................................................ 10

**Rules**

Fed. R. Civ. P. 56 .............................................................................................................. 1

**MOTION FOR SUMMARY JUDGMENT**

Now come Plaintiffs, Pastor Clyde Reed and Good News Community Church ("Good News" or "Church"), through counsel, and move this honorable Court for Summary Judgment pursuant to Fed. R. Civ. P. 56.  Plaintiffs request that the Court declare the Town of Gilbert's ordinances discriminating against temporary church signs unconstitutional, enjoin the Town from further enforcement or reenactment of these unconstitutional policies, and award nominal damages to the Plaintiffs.  As grounds for this motion, Plaintiffs rely upon their Amended Verified Complaint and exhibits attached thereto, ("Compl."), the exhibits attached hereto ("Ex."), Plaintiffs' Statement of Undisputed Facts ("PSUF"), Affidavit of Pastor Clyde Reed in Support of Summary Judgment ("Reed SJ Aff."), Affidavit of Clyde Reed in Support of Plaintiffs' Second Motion for Preliminary Injunction ("Reed PI Aff."), [1] the parties' Joint Stipulated Statement of Facts and exhibits attached thereto ("JSSF"), and the following Memorandum of Law.

**MEMORANDUM OF LAW**

The undisputed facts show Gilbert discriminates against Good News' signs inviting people to church and telling them how to get there based on religious content. Defendants' witnesses conceded in depositions that each sign is treated differently based on "message" and "what it says."  And Article 4.4 of Defendants' Ordinances ("Sign Code") [2] places stricter regulations on the Church's signs than it does a substantial number of other organizations' signs.  This discrimination violates Good News' freedoms of religion, speech, and equal protection.

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a

---

[1] As instructed by LRCiv 7.1(d)(1), Plaintiffs incorporate this affidavit, as well as the exhibits that are attached to the Plaintiffs' Second Motion for Preliminary Injunction, by reference instead of resubmitting them.

[2] All applicable sections of the Sign Code are attached to the JSSF as Ex. A.

judgment as a matter of law."  Fed. R. Civ. P. 56(c).  Plaintiffs' Statement of Undisputed Facts adequately demonstrates that there is no genuine issue as to any material fact.  The Plaintiffs are entitled to judgment as a matter of law on all of their claims.

## I.   THE SIGN CODE DISCRIMINATES BETWEEN GOOD NEWS' SPEECH AND OTHER NONCOMMERCIAL AND COMMERCIAL SPEECH.

In its previous order denying Plaintiffs' Motion for Preliminary Injunction, this Court recognized that Plaintiffs' signs are protected religious speech,[3] and that if the Town regulates these signs based on their content, the ordinance is presumptively unconstitutional, is subject to strict scrutiny, and will only be upheld if narrowly drawn to serve a compelling state interest.   Order at 8-9 (Doc. 43).   Although this Court preliminarily determined that the portion of the Sign Code regulating the Church's signs was not content based as it related to other sections affecting commercial speech and the Ninth Circuit affirmed, the Court did not consider whether the Church's signs were being regulated based on content as compared to other noncommercial speech.  *Reed v. Town of Gilbert*, 587 F.3d 966, 983 (9th Cir. 2009).[4]  The Ninth Circuit said the Town "may not favor certain noncommercial speech without facing stricter review," *id.* at 982, and specifically pointed out that the Sign Code treats the Church's directional signs differently than Political and Ideological Signs.  *Id.* at 983.

The face of the Sign Code,[5] as well as subsequent discovery, demonstrate that the content based discrimination the Ninth Circuit warned may exist is in fact taking place – both as between different types of noncommercial speech, and between noncommercial

---

[3] It is undisputed that Plaintiffs' signs are speech that is protected by the First Amendment. Complaint and Answer at ¶ 84.

[4] It is well-settled that decisions at the preliminary injunction stage are just that, preliminary, and generally not law of the case. *Ranchers Cattlemen Action Legal Fund United Stockgrowers of America v. U.S. Dep't of Agric.*, 499 F.3d 1108, 1114 (9th Cir. 2007).

[5] The Sign Code violates Plaintiffs' free speech rights as applied to them, and facially as set forth in the overbreadth argument below.  The Ninth Circuit explains this distinction in its opinion in this case.  587 F.3d at 974.

2

and commercial speech.  And recent Supreme Court guidance confirms the Sign Code is content based.

### A. The Sign Code Discriminates Against the Church's Speech Based on Content.

The Ninth Circuit recognized, and the undisputed facts indicate, the Sign Code differentiates between signs based solely on content.  One of the best examples of this content based discrimination is the abundant evidence of the proliferation of political signs (as well as many others) that are subject to far more lenient restrictions than those of the Church.  *See* Reed SJ Aff. and numerous pictures of signs attached thereto.

A "Political Sign" is defined as "[a] temporary sign which supports candidates for office or urges action on any other matter on the ballot of primary, general and special elections relating to any national, state or local election."  JSSF, Ex. B.  An "Ideological Sign" is defined as "[a] sign communicating a message or ideas for non-commercial purposes that is not a construction sign, directional sign, temporary directional sign relating to a qualifying event, political sign, garage sale sign, or a sign owned or required by a governmental agency."  *Id*.  HOA event signs are described as "[b]anners and directional signs . . . that display information concerning seasonal or temporary events occurring in the development."  *Id.*  And the Church's signs, which fall under the provision governing "Temporary Directional Signs Relating To A Qualifying Event" are defined as "a temporary sign intended to direct pedestrians, motorists, and other passersby to . . . any assembly, gathering, activity, or meeting sponsored, arranged, or promoted by a religious, charitable, community service, educational, or other similar non-profit organization."  *Id.*

The Town imposes different standards on these different types of signs (and far more stringent standards on the Church's signs) based solely on their content.  Defendants' witness, Michael Milillo, who is responsible for interpreting the Sign Code, conceded that all signs communicate a message or idea. Milillo Dep. at 10-11, 20-21 (Ex. 1).[6]  And

---

[6] Unless otherwise indicated, exhibits are attached to this motion and memorandum.

3

in response to a question concerning how those responsible for applying the Sign Code determine which provisions to apply to a particular sign, he testified:

> Well, like anything in the zoning code, you've got to review each individual case and *review each individual sign that comes before you to see what the elements are, what is the message.* Is it identifying a business? If it's identifying a business and it's in a certain zoning district, it's not going to be an ideological sign. You know, if it's just a sign that's *communicating a message* and it has no purpose in identifying a specific business or site and you can't categorize it as anything else in the glossary of the sign types, then perhaps it's an ideological sign.

*Id.* at 21 (emphasis added). Similarly, Karen Coats, a zoning inspector, testified that in order to tell the difference between a directional sign for an HOA meeting and a Church meeting, "you would have to identify what it says on there." Coats Dep. at 18 (Ex. 2). As the Supreme Court recently confirmed in *Holder v. Humanitarian Law Project*, 130 S.Ct. 2705, 2723-24 (2010), a statute is content based if its applicability to particular speakers "depends on what they say."

Sign ordinances that impose different standards based on the content of signs have been struck down by numerous federal courts, including the Ninth Circuit. *Foti v. City of Menlo Park*, 146 F.3d 629, 636-37 (9th Cir. 1998) (plaintiffs likely to succeed on merits of claim that ordinance granting exemptions to ban of signs on public property to open house, real estate, safety, traffic, and public information signs was content-based regulation); *Desert Outdoor Adver. v. City of Moreno Valley*, 103 F.3d 814, 817 & 820 (9th Cir. 1996) (city sign code that restricted some noncommercial signs to just three zoning districts while permitting many other noncommercial signs in any zone within the city was content-based); *Nat'l Adver. Co. v. Town of Babylon*, 900 F.2d 551, 557 (2nd Cir. 1990) (cited favorably by *Desert Outdoor Advertising* and holding sign ordinance provisions that treat noncommercial signs less favorably than "temporary political signs and …signs identifying a grand opening, parade, festival, fund drive or other similar occasion impermissibly discriminate between types of noncommercial speech based on content."); *Whitton v. City of Gladstone*, 54 F.3d 1400 (8th Cir. 1995)) (sign ordinance

4

that imposed durational time limits on political but not other signs stricken as content-based regulation of speech).

The testimony of Milillo and Coats that application of the Sign Code depends on the message of the particular sign makes this case completely different than *G.K. Limited Travel v. City of Lake Oswego*, 436 F.3d 1064 (9th Cir. 2006).  There, all that concerned government officials was whether the sign had changed – regardless of the message.  Officials did not even have to be able to read English to enforce the ordinance.  Here, different (and more favorable) regulations apply if the message is political or ideological, instead of religious and directional.

This case is therefore governed by the previously cited cases where the municipality enacted a sign code that imposed different restrictions based on a sign's message.  For example, in *Whitton*, the challenged ordinance imposed durational limits on political signs that it did not impose on other signs.  Under the ordinance, political signs could not be placed until 30 days before an election and had to be removed within 7 days after the election.  54 F.3d at 1401-02.  The Eighth Circuit held that the provision was content based because "[t]he words on a sign define whether it is subject to the durational limitations."  *Id*. at 1404.  The effect of the ordinance was to favor other noncommercial speech over political speech.  As the Court observed,

> a permanent year around ground sign expressing support for a particular sports team would not be subjected to the durational limitations while an identical sign made of the same material, with the same dimensions and the same colors, and erected on the same spot advocating a particular candidate for political office would be.

*Id*.  This different treatment, based solely on the content of signs, rendered the ordinance content-based.  *Id*.

While in *Whitton* the ordinance's only vice was its different durational limit, here the Town's Code goes much further, and in addition to different duration requirements, it also imposes different location, number, size, and permitting requirements based solely on sign content.  For example, pursuant to §4.402I ("Political Signs"), a person may display a limitless number of signs promoting their favorite candidate on up to 32 square

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

foot signs, within rights-of-way, any time before an election and up to 10 days after an election.  On the other hand, the Church may display a far more limited number of signs (four per property) advertising services, and on only 6 square foot signs.  It must place the signs only 12 hours before services and take them down 1 hour after its services, and cannot place them within rights-of-way.  § 4.402P.1-5.  So the McCain campaign could post an unlimited number of 4' x 8' signs right now that say "McCain for President 2012, Visit Our Campaign Headquarters One Block Down," but the Church can't put up a 2' x 3' directional sign for services this Sunday till 9 o'clock Saturday night, and must take it down an hour after the service.

Ideological Signs are also treated more favorably than the Church's.  The only restriction placed on these signs is they cannot be more than 20 square feet (14 more than the Church's).  So they can be placed in the right of way for any length of time the speaker desires.  § 4.402J.  And more favorable treatment is provided for Homeowners Association Facilities Temporary Signs too.  They can be displayed 30 days prior to each event, and 48 hours after, and have a total size of 80 square feet.  § 4.406C(3).

This is exactly the kind of favoritism for certain noncommercial speech the Ninth Circuit said must be subjected to strict scrutiny.  587 F.3d at 982.  Similar discrimination based on speaker identity was recently addressed and rejected by the Supreme Court in *Citizens United v. Federal Election Commission*, 130 S.Ct. 876 (2010).  The statute at issue there prohibited corporations from engaging in certain political speech within 30 days of a primary or 60 days of a general election.  First, the court treated this event-based restriction as "an outright ban" on speech.  *Id.* at 897.  The Court was unimpressed by the fact that corporations were free from this restriction at all other times.  The same is true in this case.  The Town's prohibitions on directional signs for churches except 12 hours prior to, and one hour after, the event being held is a ban on such speech during all other times.

Second, varying restrictions based on speaker identity are likely content based.  The Court recognized that "the First Amendment stands against attempts to disfavor certain subjects or viewpoints."  *Id.* at 898.  But it was careful to point out that "[p]rohibited, too,

are restrictions distinguishing among different speakers, allowing speech by some but not others.  As instruments to censor, these categories are interrelated: ***Speech restrictions based on the identity of the speaker are all too often simply means to control content***." *Id.* at 899 (citations omitted; emphasis added).  "The First Amendment does not permit Congress to make these categorical distinctions based on the corporate identity of the speaker and the content of the political speech." *Id.* at 913.  This is exactly what's going on in Gilbert.  Non-profits, politicians, homeowners associations, and builders are all treated differently based on their identity.  The Supreme Court has determined this is just another way of engaging in content based discrimination.

The Town's argument that differential treatment doesn't necessarily mean discrimination is occurring is unavailing.  For instance, the fact that real estate developers must obtain a permit before being able to place 15 directional signs in the right of way every weekend of the year does not nullify the constitutional problems with restricting the Church's signs to only 12 hours before and one hour after services.  The Eighth Circuit properly rejected this argument in *Whitton* where the plaintiff alleged that political speech was being treated less favorably than commercial speech by the town of Gladstone.

> Gladstone argues that it favors political speech over commercial speech because some commercial signs are subject to application and permit requirements while political signs are not. However, no permit is required to erect a construction sign or real estate sign and these signs may be posted longer than political signs are. Moreover, ***we are aware of no authority which allows restrictions imposed on commercial speech to offset other restrictions imposed on noncommercial speech, achieving a sort of balance, in order to render the challenged provision content-neutral.***

54 F.3d at 1405 n.9 (emphasis added).  This makes sense because only speakers can determine the best means for communicating their speech.  It is not the place of the government to decide that the means of speech it does allow is just as effective as those it prohibits.  *Meyer v. Grant*, 486 U.S. 414, 424 (1988) ("The First Amendment protects appellees' right not only to advocate their cause but also to select what they believe to be the most effective means for so doing.").  And in this case, Pastor Reed has testified that

7

he would gladly go through the process of obtaining a permit if it meant having the same opportunity to post temporary directional signs that builders have.  Reed SJ Aff. at ¶ 48.

Under the Sign Code, the Church's religious signs must be smaller in size, less in number, located in less visible places, and displayed for a far shorter period of time than other signs containing noncommercial (and commercial) messages.  This is blatant content based discrimination that cannot be justified.

### B.  The Sign Code Does Not Survive Strict Scrutiny.

The only interests submitted by the Town to justify this content based discrimination are safety and aesthetics (Compl. and Answer at ¶ 24), which no court has ever held to be sufficiently compelling to satisfy strict scrutiny.  *Nat'l Adver. Co. v. City of Orange*, 861 F.2d 246, 249 (9th Cir. 1988) (interests in "traffic safety and aesthetics" are "substantial" but not "compelling"); *Whitton*, 54 F.3d at 1408 ("[A] municipality's asserted interests in traffic safety and aesthetics, while significant, have never been held to be compelling."); *Solantic, LLC v. City of Neptune Beach*, 410 F.3d 1250, 1267 (11th Cir. 2005) ("aesthetics and traffic safety" not compelling interests).  The Town's interests in safety and aesthetics cannot justify its discrimination against religious speech.

The Town further undermines any claim that its interests are "compelling" by unequally treating, based solely on content, signs that have the exact same impact on its interests in safety and aesthetics.  A municipality's professed interests for adopting a sign code cannot be considered compelling if the code permits the proliferation of signs that impact those interests to the same extent as signs that are restricted in the name of those interests.  *Nat'l Adver. Co.*, 861 F.2d at 249 (noting that in *Metromedia, Inc. v. City of San Diego*, 453 U.S. 490 (1981) the Supreme Court "relied on San Diego's allowance of some billboards as evidence that its interests in traffic safety and aesthetics . . . fell shy of compelling") (internal quotation marks and citation omitted)).  The same is true here.  For instance, the Town permits political signs to be up to 32 square feet in area, placed at any time prior to an election and removed 10 days after the election, and unlimited as to number.  § 4.402I.  The Town cannot credibly argue that its interests in safety and

aesthetics are compelling as to the Church when it liberally permits political (and many other) signs, which impact those interests at least the same as the Church's signs. *See* Reed SJ Aff. and pictures attached thereto. The Town's safety and aesthetic interests are not compelling as a matter of law, and its Code therefore fails the strict scrutiny test.

The Sign Code also fails the strict scrutiny test because it is not narrowly tailored. To pass the narrow tailoring requirement, a content-based restriction must be the "least restrictive means to further a compelling interest." *Foti*, 146 F.3d at 637. It is difficult to imagine a sign code that is lacking in this regard more than the Town's. The Sign Code simply does not make the community more beautiful or safe by severely limiting the Church's signs, yet at the same time permitting the proliferation of Political, Ideological, Home Sale Weekend Directional, and HOA event signs – all of which impact the Town's interests in the same way as the Church's signs. The 56 pictures of numerous temporary signs throughout Gilbert attached to Pastor Reed's SJ Affidavit adequately demonstrate how the copious signs permitted under the Sign Code undermine any interest the Town might have in restricting the Church's signs. Because the Sign Code's content-based distinctions have "no relationship to the underlying purpose" of the Code, *Whitton*, 54 F.3d at 1407, it lacks the requisite tailoring.

### C. The Sign Code is Impermissibly Vague and Overbroad.

Under the vagueness doctrine "laws must provide explicit standards for those who apply them." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). Vague policies violate two fundamental principles: (1) they leave the public guessing as to what speech is proscribed; and (2) they invite arbitrary and discriminatory enforcement by giving unbridled discretion to enforcement officials. *Id*. at 109; *see also Connally v. General Const. Co.*, 269 U.S. 385, 391 (1926). Left with only vague or non-existent criteria on which to base their decision, government officials "may decide who may speak and who may not based on the content of the speech or the viewpoint of the speaker." *City of Lakewood v. Plain Dealer Publishing Co.*, 486 U.S. 750, 757, 763-64 (1988).

There are no guidelines in the Sign Code to help government officials determine which category a sign falls into if it has two different kinds of speech on it. For example,

Michael Milillo, the person in charge of interpreting the Code, was asked which part of the Code governs a sign that contains both directions to a church and a political message. He responded:  "there's two different types of messages on it, but it's giving direction to the qualifying event. And so, you know, if there's a political message on it as well, you know, it's a judgment call.  Now, maybe others on our staff would look at it differently and they might categorize it as political sign."  Milillo Dep. at 30 (Ex. 1).  In other words, whether a sign is legal or illegal under the Sign Code depends on who is enforcing it. When applied to protected speech, this vagueness is unacceptable.

The Sign Code also restricts more speech than is necessary to further the Town's interests in aesthetics and safety, and is therefore overbroad.  Generally, the overbreadth doctrine prohibits laws that "sweep unnecessarily broadly and thereby invade the area of protected freedoms."  *NAACP v. Alabama*, 377 U.S. 288, 307 (1964).  And when a law impinges on First Amendment rights, "government may regulate only with narrow specificity."  *NAACP v. Button*, 371 U.S. 415, 433 (1963).  Accordingly, a law is void for overbreadth where it "does not aim specifically at evils within the allowable area of [government] control but . . . sweeps within its ambit other activities that in ordinary circumstances constitute an exercise" of protected rights.  *Alabama v. Thornhill*, 310 U.S. 88, 97 (1940).  As demonstrated above, the Sign Code is far from narrowly tailored, and is therefore impermissibly overbroad.

## II.   THE SIGN CODE VIOLATES PLAINTIFFS' FREEDOM OF RELIGION PROTECTED BY THE FIRST AMENDMENT AND ARIZONA'S FERA.

Good News' signs announcing its regular meeting time are religiously-motivated efforts to spread the gospel in accordance with the biblical Great Commission, Matthew 28:19-20.  Compl. at ¶¶ 43-49.  These signs are one of the primary ways in which the Church encourages new people to join in their worship.  *Id.*  The Church, which rents its meeting space from a local school, does not own property, and cannot place a permanent sign on it.  It depends on temporary signage to direct potential attendees to the meetings.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*Id.* ¶¶ 50-52.  The harsh restrictions placed on the Church's directional signs as compared to similar secular signs violate the free exercise protections of federal and state law.[7]

### A. The Ordinance Must Be Subjected to Strict Scrutiny Under the Free Exercise Clause Because it is Not Generally Applicable.

Gilbert's Sign Code is unconstitutional under the Free Exercise Clause of the First Amendment because it strictly limits the signage of religious organizations, but places more lenient restrictions on similar non-religious signs.  Regulations restricting religious freedom must be rationally-based, neutral, and generally applicable.  *Employment Div., Dept. of Human Res. of Or. v. Smith*, 494 U.S. 872, 879 (1990).  If a regulation is either *not* neutral or *not* generally applicable, it is unconstitutional unless the government can establish it is narrowly tailored to advance a compelling interest.[8]  *Church of the Lukumi Babalu Aye v. City of Hialeah*, 508 U.S. 520, 531-32 (1993).

One indication a law is not generally applicable is that it is underinclusive with regard to the purposes it is attempting to achieve.  In *Lukumi*, the Supreme Court found Hialeah's law restricting ritual sacrifices of animals failed to achieve its public health purposes because of the substantially underinclusive way in which many types of animal killings, aside from sacramental killings, were permitted.  508 U.S. at 542.  Since then, Circuit Courts have made similar findings. For example, in *Blackhawk v. Pennsylvania*, 381 F.3d 202 (3d Cir. 2004), the Third Circuit determined that a wildlife conservation inspired prohibition on keeping black bears without a license that did not apply to zoos and circuses was not generally applicable.  The Court articulated the standard as follows:

---

[7] The Sign Code facially violates Plaintiffs' freedom of religion because it is underinclusive, *Church of the Lukumi Babalu Aye v. City of Hialeah*, 508 U.S. 520, 508 (1993).  It is also unconstitutional as it is being applied to the Church to restrict its religious freedom.  *See Sherbert v. Verner*, 374 U.S. 398 (1963) (unemployment regulations applied to require Seventh Day Adventist to work on Sabbath were unconstitutional).

[8] Strict scrutiny is also warranted because this is a hybrid rights case in which a Free Exercise Claim is brought in conjunction with other constitutional claims, such as free speech.  *Smith*, 494 U.S. at 881; *San Jose Christian College v. City of Morgan Hill*, 360 F.3d 1026, 1031-32 (9th Cir. 2004).

> A law fails the general applicability requirement if it burdens a category of religiously motivated conduct but exempts or ***does not reach a substantial category of conduct that is not religiously motivated and that undermines the purposes of the law to at least the same degree as the covered conduct that is religiously motivated.***

*Id.* at 209 (emphasis added).

Gilbert's Sign Code is similarly underinclusive with respect to its purposes of aesthetics and safety.  As demonstrated above, the Church's temporary directional signs must abide by strict limitations as set forth in § 4.402(P), while more lenient limitations are placed on Political, Ideological, and HOA Signs.   And these are just the non-commercial signs that are not restricted as severely as the Church's.   Real estate developers can place up to 15 weekend directional signs in the right of way by simply obtaining a 1 year permit.  § 4.405(B)(2).  Documents provided by the Town indicate it granted 119 such permits to 26 different builders during the period of July 2004 to April 2010. Ex. 5.  Other businesses are free to place "A-frame" signs similar to those used by the Church in front of their businesses in the right of way.  § 4.402(N).  The net adverse effect all of these signs have on the Town's concern for aesthetics and safety demonstrates its severe restrictions on the Church's signs are substantially underinclusive.  *See* 56 pictures of signs in Gilbert attached to Reed SJ Aff.

This is very similar to the government action found unconstitutional in *Tenafly Eruv. Assoc., Inc. v. Borough of Tenafly*, where the court applied strict scrutiny to regulations prohibiting Orthodox Jews from attaching *lechis* for Sabbath observance to utility poles, 309 F.3d 144, 169-70 (3d Cir. 2002).  Borough officials prohibited other items besides *lechis*, but did not enforce the regulation against house numbers, directional signs, ribbons supporting the school, and lost animal signs. *Id.* at 151.  The court determined government officials "contravene the neutrality requirement if they exempt some secularly motivated conduct but not comparable religiously motivated conduct."  *Id.* at 166.

Gilbert's attempt to promote the safety and beauty of its town and roads by restricting the Church's directional signs more severely than a substantial number of other signs displayed for secular purposes makes the Sign Code underinclusive.  In light of religion's constitutionally protected character, the regulation must therefore be subjected to strict scrutiny which requires these regulations to be narrowly tailored to achieve a compelling government interest.  *Lukumi*, 508 U.S. at 531-32.

Moreover, regulations giving lip-service to a particular purpose while not regulating a substantial amount of other conduct that undermines the same central goal are referred to by *Lukumi* as legislative attempts to "gerrymander" and are unconstitutional.  *Id.* at 536.  As in *Lukumi*, there is evidence that Gilbert's discrimination against religious signs is intentional.  In the meeting where the current version of the Sign Code was adopted, a town official stated "there is some litigation that has been filed against the Town of Gilbert relative to temporary directional signs for religious assembly and that is the main reason behind the processing of this text amendment".  Compl., Ex. 6.

Amending a code in response to litigation to fix provisions that treat churches less favorably is certainly permissible.   But amending it in such a way that religious organizations are still treated less favorably than many other types of speakers (with a few more types of non-commercial speakers thrown in to give the appearance of neutrality) is evidence of purposeful discrimination. "Although a law targeting religious beliefs as such is never permissible, if the object of a law is to infringe upon or restrict practices because of their religious motivation, the law is not neutral…. Official action that targets religious conduct for distinctive treatment cannot be shielded by mere compliance with the requirement of facial neutrality. The Free Exercise Clause protects against governmental hostility which is masked as well as overt." *Lukumi*, 508 U.S. at 533-34 (citations omitted).

## B.  Strict Scrutiny is Also Required Under Arizona's FERA.

Under Arizona's Free Exercise of Religion Act ("FERA"), Ariz. Rev. Stat. Ann. § 41-1493.01 (2004), the burden of proof shifts to the Government after three elements have been shown: "(1) that an action or refusal to act is motivated by a religious belief, (2) that

13

the religious belief is sincerely held, and (3) that the governmental action substantially burdens the exercise of religious beliefs." *State v. Hardesty*, 214 P.3d 1004, 1007 (Ariz. 2009).   Because the FERA is new, the Arizona Supreme Court looks to numerous Supreme Court and Circuit Court cases decided prior to the ruling in *Smith* when interpreting it – several of which are cited below.  *Id.* at 1007.[9]

**1.  The Church has a Sincerely Held Religious Belief to Reach Out to the Public Through Use of Signs.**

It is undisputed that the Church's display of directional signs is motivated by the religious belief of fulfilling the Great Commission.  Compl. at ¶¶ 43-49.  The centrality of this belief to the Church is not a matter for judicial determination.  "Repeatedly and in many different contexts, we have warned that courts must not presume to determine the place of a particular belief in a religion or the plausibility of a religious claim."  *Smith*, 494 U.S. at 887.

The Fifth Circuit recently applied this rule in determining a religious organization's use of a residence to minister to ex-cons was a sincerely held religious belief.  It observed in *A.A. v. Needville Indep. Sch. Dist,*when interpreting the Texas Religious Freedom Restoration Act, Tex. Civ. Prac. & Rem. Code § 110.003, (the operative language of which is virtually identical to FERA), "it is not necessary to determine that the act or refusal to act is motivated by a central part or central requirement of the person's sincere religious belief.  Not only is such a determination unnecessary, it is impossible for the judiciary."  633 F.3d 248, 260 (5th Cir. 2010) (citations and quotation marks omitted).

**2.  Defendants' Sign Code Places a Substantial Burden on Plaintiffs' Free Exercise of Religion.**

---

[9] The Arizona Supreme Court noted in *Hardesty* that "FERA parallels RFRA."  214 P.3d at 1006.  RFRA – the federal Religious Freedom Restoration Act, 42 U.S.C.A. § 2000bb – states on its face that it was enacted in response to *Smith*  and designed "to restore the compelling interest test as set forth in *Sherbert v. Verner*, 374 U.S. 398 (1963) and *Wisconsin v. Yoder*, 406 U.S. 205 (1972)," which are specifically referred to in *Hardesty*.

FERA does not define "substantial burden," other than stating that the term "is intended solely to ensure that this article is not triggered by trivial, technical or de minimis infractions." A.R.S. § 41-1493.01(E). But the Arizona Supreme Court referenced several cases in *State v. Hardesty*, that provide guidance in interpreting this provision. One of these is the Supreme Court decision in *Wisconsin v. Yoder*, 406 U.S. 205, 218-220 (1972), holding that compulsory secondary education laws "unduly burden the exercise of religion" of Amish families who want to make sure their children are not exposed to modern lifestyles. It did not matter that the families could have attempted to work out some accommodation or moved to other states and not been subjected to these rules. *Id.* at 218 n.9.

In another case cited by *Hardesty*, *Sherbert v. Verner*, 374 U.S. 398, 403-06 (1963), the Supreme Court determined that an employee's religious belief not to work on Saturdays was substantially burdened by conditioning unemployment benefits on forfeiture of that belief. That the burden was only "indirect" (no criminal sanctions) and employment benefits are a "privilege not a right" did not preclude a finding that the burden was substantial. "Here not only is it apparent that appellant's declared ineligibility for benefits derives solely from the practice of her religion, but the pressure upon her to forego that practice is unmistakable. The ruling forces her to choose between following the precepts of her religion and forfeiting benefits…." *Id.* at 404.

Likewise, the Sign Code burdens the Church's religious beliefs regarding reaching out to the community through signs that invite them to church and show them how to get there. The Church is not large and its directional signage is a primary method of communicating with the community. Compl. ¶¶ 47-49. In testimony elicited by opposing counsel, Pastor Reed testified that the Church's highest attendance was 38 when it could display its signs on equal terms with other similar signs and it is only about

15

30 now – a 21% reduction.   Reed Dep. at 12.   The Sign Code's adverse affect on attendance is substantial.[10]

### 3.  The Sign Code Does Not Survive Strict Scrutiny.

The Free Exercise Clause and FERA both mandate strict scrutiny in this case.  "A law burdening religious practice that is not neutral or not of general application must undergo the most rigorous of scrutiny. To satisfy the commands of the First Amendment, a law restrictive of religious practice must advance interests of the highest order and must be narrowly tailored in pursuit of those interests."  *Lukumi*, 508 U.S. at 546 (citation and quotation marks omitted).   Under FERA, the "Government may substantially burden a person's exercise of religion ***only if*** it demonstrates that application of the burden to the person is both: 1. In furtherance of a compelling governmental interest; [and] 2. The least restrictive means of furthering that compelling governmental interest." A.R.S. § 41-1493.01(C) (emphasis added).

It has already been demonstrated in the Free Speech argument above that the Sign Code fails strict scrutiny.  The same is true with regard to Free Exercise – especially since it has the added requirement that "the Government …[must] demonstrate that the compelling interest test is satisfied through application of the challenged law 'to the person'-the particular claimant whose sincere exercise of religion is being substantially burdened.  [Courts must] look[ ] beyond broadly formulated interests justifying the general applicability of government mandates and scrutinize[ ] the asserted harm of granting specific exemptions ***to particular religious claimants***."  *Gonzales v. O Centro*

---

[10] If the Sign Code treated the Church's signage as it does political and ideological signage, there would be no substantial burden.  This is significant because the Ninth Circuit found that an ordinance that does not appear to burden religious organizations or institutions can become a substantial burden when the policy underlying the ordinance is inconsistently applied, as was Sutter County, California's policy of limiting non-agricultural land use to areas closer to town. *Guru Nanak Sikh Society v. County of Sutter*, 456 F.3d 978, 990-991 (9th Cir. 2006) (County allowed at least one other church and a housing development in agriculturally zoned land, which was inconsistent with its policy of preserving agricultural land for farming).

*Espírita Beneficente União do Vegetal*, 546 U.S. 418, 430-431 (2006) (the Arizona Supreme Court specifically relies on *O Centro* to interpret FERA in *Hardesty*). There is absolutely no evidence that the Town has any compelling interest in regulating the Church's signs more strictly than Political, HOA, Ideological, and Real Estate Developer signs. The Town is violating the Free Exercise rights of the Church.

## III.   THE SIGN CODE VIOLATES THE CHURCH'S EQUAL PROTECTION RIGHTS.

"The Equal Protection Clause of the Fourteenth Amendment commands that no State shall deny to any person within its jurisdiction the equal protection of the laws, which is essentially a direction that all persons similarly situated should be treated alike." *Serrano v. Francis*, 345 F.3d 1071, 1081 (9th Cir. 2003) (quotation marks and citation omitted). The Church's signs are treated differently because its speech is religiously motivated.

Government classifications that "employ[] a suspect class (such as race, religion, or national origin) or burden the exercise of a constitutional right" are subject to strict scrutiny. *Ball v. Massanari*, 254 F.3d 817, 823 (9th Cir. 2001) (citation omitted). The Sign Code does both. It imposes different duration, location, number, size, and permitting requirements based on the content of signs, and severely restricts religious signs as compared to similar noncommercial and commercial signs. Therefore, the Sign Code fails under equal protection analysis as well.

## CONCLUSION

The undisputed facts show the Town treats the Church's speech less favorably based on its religious content. As a matter of law, this violates the Church's rights under the Free Speech and Free Exercise Clauses of the First Amendment, Arizona's FERA, and the Equal Protection Clause of the Fourteenth Amendment. The fact that, after this lawsuit was filed, the Town added a few other types of noncommercial speech to this less favored category does not obviate this illegality any more than would adding Asians and Hispanics to a law that discriminates against Blacks. Summary judgment should be awarded to the Church.

17

Respectfully submitted this 27th day of August, 2010.

s/Jeremy D. Tedesco

| | |
|---|---|
| Benjamin W. Bull | David A. Cortman* |
| AZ Bar No. 009940 | GA Bar No. 188810 |
| bbull@telladf.org | dcortman@telladf.org |
| Jeremy D. Tedesco | Alliance Defense Fund |
| AZ Bar No. 023497 | 1000 Hurricane Shoals Rd., NE |
| jtedesco@telladf.org | Building D, Suite 600 |
| Alliance Defense Fund | Lawrenceville, GA 30043 |
| 15100 N. 90th Street | (770) 339-0774 |
| Scottsdale, AZ 85260 | (770) 339-6744 facsimile |
| (480) 444-0020 | |
| (480) 444-0028 facsimile | |
| | *Admitted pro hac vice |

*Attorneys for Plaintiffs*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CERTIFICATE OF SERVICE**

I hereby certify that on August 27, 2010, I electronically filed the foregoing paper with the Clerk of Court using the ECF system which will send notification of such filing to the following:

Kim S. Alvarado
Grasso Law Firm, P.C.
2430 West Ray Road, Suite 3
Chandler, AZ 85224

*Attorney for Defendants*

s/Jeremy D. Tedesco
JEREMY D. TEDESCO
AZ Bar No. 023497
ALLIANCE DEFENSE FUND
15100 N. 90th Street
Scottsdale, AZ 85260
(480) 444-0020; (480) 444-0028 facsimile
jtedesco@telladf.org

19